UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

KONELL CONSTRUCTION
and DEMOLITION CORP.,

                    Plaintiff,

      v.

VALIANT INSURANCE
COMPANY,

                    Defendant.

No. CV03-412-MO

OPINION AND ORDER

**MOSMAN, J.,**

      Plaintiff, Konell Construction and Demolition Corp. ("Konell") filed this action against defendant Valiant Insurance Company ("Valiant") for Valiant's failure to defend or indemnify Konell for a petroleum pollution incident resulting in environmental contamination and property damage at a construction site. Upon initial consideration, this court entered a judgment (#25) granting Valiant's motion (#12) for summary judgment and denying Konell's cross-motion (#16) for summary judgment. The Ninth Circuit reversed and remanded because the district court improperly rejected Konell's argument that Valiant had to show it was prejudiced by Konell's late notice in order to avoid its policy obligations. On remand, this court finds Valiant had a duty to indemnify and therefore Konell's motion for summary judgment (#16) is GRANTED in part; Valiant is liable under the Limited Pollution Coverage policy to pay Konell $100,000 for the property damage. Because the question of whether Valiant also had a duty to defend involves speculation and guesswork, summary judgment on that issue is DENIED for both parties.

PAGE 1 - OPINION AND ORDER

I.      BACKGROUND

    A.      Undisputed Facts

Konell purchased a general commercial liability ("GCL") policy from Valiant. Because the GCL policy contained an exclusion for pollution-related incidents, Konell also purchased a Limited Pollution Coverage Form that provides limited coverage for pollution-related incidents on specifically defined terms, up to $100,000.

The Limited Pollution Coverage policy requires Valiant to pay "those sums that [Konell] . . . becomes legally obligated to pay as compensatory damages because of . . . 'property damage' resulting from environmental contamination' . . . or . . . [i]ncurs or becomes legally obligated to pay as 'clean up costs' . . . resulting from 'environmental contamination' . . ." Limitations to coverage require that the property damage and the environmental contamination be "caused solely by a 'pollution incident' which must happen at or emanate from a 'work site' . . . commence and end within 72 consecutive hours, and . . . [b]e reported by [Konell] to [Valiant] within 30 days of the commencement of the 'pollution incident.'" Pl.'s Am. Compl., Ex. A, 16-40.

UBEHO Investment Co. ("UBEHO") hired Konell to demolish and remove a building that had been destroyed by fire. Part of the project involved replacing the resultant hole with fill. Konell filled the hole with foundation rubble from the demolition site and more than 130 truckloads of soil from another site. This fill work began on Friday, July 18, 1997, paused for the weekend, resumed on Monday, July 21, and continued to Tuesday, July 22, 1997.

On September 11, 1997, UBEHO notified Konell by letter that testing revealed petroleum contamination in the fill dirt delivered to the site by Konell. UBEHO demanded that Konell

immediately remove the contaminated soils and replace them with clean fill, but Konell denied any responsibility for the contamination of the site. Pl.'s Am. Compl. ¶ 7. Konell notified Valiant of UBEHO's claim. Pl.'s Concise St. Mat. Facts ¶ 10; Def.'s Concise St. Mat. Facts ¶¶ 10, 13. In a letter dated October 16, 1997, Valiant, citing various terms of the policy, denied any obligation to defend or indemnify Konell.

UBEHO's claims against Konell were subsequently submitted to arbitration. Pl.'s Concise St. Mat. Facts ¶ 12; Def.'s Concise St. Mat. Facts ¶ 12. The arbitrator found that Konell imported contaminated fill dirt, and awarded remediation costs to UBEHO totaling $184,883 plus interest. *Id*. During the arbitration process, Konell incurred attorney fees and costs totaling $93,916.01. *Id*. At the conclusion of the arbitration, Konell "re-tendered the pollution claim to Valiant in a letter dated October 19, 2000." Pl.'s Am. Compl. ¶ 11.

    B.    Procedural History

        1.    Summary Judgment Proceedings in the District Court

These cross motions for summary judgment originally came before the court on March 16, 2004. This court granted summary judgment in favor of Valiant, ruling that coverage was barred due to Konell's failure to provide Valiant with notice of the pollution incident within 30 days of its commencement, and because of this, Valiant had no duty to defend. In finding summary judgment was appropriate on this one policy exclusion, the court did not reach the other two issues raised by Valiant: 1) whether the pollution incidents commenced and ended within 72 consecutive hours, and 2) whether the pollution incidents occurred at a work site.

      2.    Ninth Circuit Decision

The Ninth Circuit disagreed and concluded that, under Oregon law, Valiant could not escape its policy obligations without showing it was prejudiced by Konell's allegedly late notice. "Because the district court incorrectly concluded that defendant need not show prejudice as a matter of law, we reverse and remand to the district court for a determination of whether genuine issues of material fact exist on that question."

The supplemental briefs submitted by the parties do not address whether there exist issues of material fact on the prejudice resulting from Konell's failure to provide notice within 30 days. Instead, the parties focus only on the two remaining policy exclusions and the duty to defend.

II.    DISCUSSION

When the facts are undisputed, and the court need only make a legal interpretation under Oregon law of terms contained within an insurance policy, summary judgment is appropriate. *R.W. Beck & Assocs. v. City & Borough of Sitka*, 27 F.3d 1475, 1478 (9th Cir. 1994). In Oregon, the plain meaning of the policy language in an insurance contract is to be given effect and the intent of the parties is determined based on the terms and conditions of the policy. *Hoffman Constr. Co. of Alaska v. Fred S. James & Co. of Or.*, 836 P.2d 703, 706 (Or. 1992); *N. Pac. Ins. Co. v. Hamilton*, 22 P.3d 739, 741 (Or. 2001). "The policy must be viewed by its four corners and considered as a whole. All parts and clauses of the policy must be construed to determine if and how far one clause is modified, limited or controlled by others." *Hamilton*, 22 P.3d at 741 (internal quotation marks and citation omitted). Courts must enforce unambiguous policy language as written in the policy. *Red Lion Hotels, Inc. v. Commonwealth Ins. Co. of Am.*, 33 P.3d 358, 361 (Or. Ct. App. 2001). In general, when an insurance policy is reasonably

susceptible to more than one construction, it should be "construed against the drafter." *Id*.

    A.    Duty to Indemnify

        1.    72 Consecutive Hours

One of the limitations to coverage requires that the property damage be caused by a 'pollution incident' which must commence and end within 72 consecutive hours. The policy defines "pollution incident" as "the emission, discharge, release, or escape of 'pollutants' which happens at or emanates from a 'work site' provided that such emission, discharge, release, or escape results in 'environmental contamination.' *The entirety of any such emission, discharge, release, or escape will be deemed to be one 'pollution incident*.'" (emphasis added). "Environmental contamination" is defined as "the injurious presence of 'pollutants' in or upon land, the atmosphere, or any water course or body of water." This court must resolve whether the 'pollution incident' is the combined dumping of contaminated soils at the site (one incident) or a series of 138 single releases each constituting its own separate "pollution incident" that commenced and ended within a 72 hour period.

Konell urges the court to calculate the duration of the pollution incident by adding only those hours Konell was at the work site (the weekdays of Monday - Friday) while excluding nighttime and weekend hours. I agree with Valiant's response: "it is implausible to suggest that 72 *consecutive* hours can reasonably be interpreted as not including certain days of the week, because by definition, the hours would not be consecutive." Def.'s Mot. for Summ. J. at 7. The real question is whether each delivery of soil constitutes a separate "pollution incident."

In support of its interpretation that each delivery of soil was a distinct pollution incident, Konell points to the policy language defining "pollution incident" as a "discharge . . . of

PAGE 5 - OPINION AND ORDER

pollutants." Konell contends:

> [I]t is easy to see when each pollution incident started and stopped. A load of contaminated soil was delivered to the site in a truck. The "pollutants" were "discharged" when the soil was dumped on the site. When all the contaminated soil had been dumped from the truck to the previously clean soil, the pollution incident stopped. Thus, each "incident" began and ended in a matter of minutes, not hours or days.

Pl.'s Reply at 7. Each individual discharge or release of pollutants, argues Konell, resulted in environmental contamination to the previously clean site. Pl.'s Supp. Mem. at 3.

Valiant posits the policy language can be reasonably interpreted in only one way: the same environmental contamination from multiple "releases" is "one pollution incident," which must commence and end within 72 consecutive hours. Valiant points out that under Konell's interpretation, any quantity of contamination may be broken into separate parts. For example, contamination caused by a pipe that leaked 1,000 gallons of fuel intermittently could be rephrased as a series of one thousand, 1 gallon releases, instead of a single pollution incident as the policy intended. Valiant argues that even assuming a pollution incident occurred at the UBEHO site, the incident was the use of contaminated fill. To hold each truckload delivery was a discrete pollution incident would render meaningless the limitation on coverage providing that the *entirety* of any such emission will be deemed to be *one* pollution incident. If the pollution incident is the combined dumping of contaminated fill, then this pollution incident did not commence and end within 72 consecutive hours, thus precluding coverage.

This court's evaluation of the two competing interpretations is guided by the rule that when an insurance policy is reasonably susceptible to more than one construction, it should be construed against the drafter. *Red Lion Hotels*, 33 P.3d at 361. Valiant clearly has a reasonable

PAGE 6 - OPINION AND ORDER

construction of the policy language, and it's interpretation may in fact be more reasonable than Konell's. However, after examining the plain meaning of the two sentences in the policy that define "pollution incident," Konell's interpretation is reasonable as well.

The policy defines "pollution incident" as "the emission, discharge, release, or escape of 'pollutants' which happens at or emanates from a 'work site' provided that such emission, discharge, release, or escape results in 'environmental contamination.' *The entirety of any such emission, discharge, release, or escape will be deemed to be one 'pollution incident.'*" There is nothing about the first sentence in the definition that renders the policy not "reasonably susceptible" to Konell's interpretation: each dump truck load was a "discharge" of "pollutants" at a "work site" resulting in "environmental contamination." Nor is the division of the overall activity into discrete dump truck loads a facially implausible application of the text of the policy, at least with regard to the first sentence. Unlike Valiant's 1,000 gallon hypothetical, each delivery of a dump truck load of contaminated soil is naturally divisible from the others. It seems indisputable, for example, that if one dump truck had unloaded contaminated soil one week, and another did the same a week later, we would view that as two separate pollution incidents. But if ten gallons leaked into the soil one week, and ten more gallons leaked the following week, it is implausible to view that as twenty pollution incidents.

Does the second sentence of the policy alter the above analysis? It is clearly an attempt to make all of something singular; i.e., to make the entirety of any discharge a single pollution incident. In some settings, this language accomplishes its apparent purpose. For example, it neatly disposes of Valiant's 1,000 gallon hypothetical. The whole discharge, not each individual gallon of it, is one pollution incident. But this second sentence begs the critical question in this

PAGE 7 - OPINION AND ORDER

case: what is a discharge (or, for that matter, emission, release or escape)? If a discharge is a single dump truck load, then the whole dump truck load is one pollution incident. If, on the other hand, a discharge is all the dump truck loads in the course of a single job at one work site, then all of them are one pollution incident. In other words, we are right back where we started, and the policy definition has not provided one clear answer.

Now, Valiant is probably the winner of the argument in one sense: at some intuitive level, its interpretation of the policy definition seems better than Konell's. In a popularity contest, Valiant's interpretation might win most of the time. But this court's task, under governing law, is not to choose the better of two interpretations. When the policy is reasonably susceptible to more than one interpretation – and this one is at least on these facts – then it should be construed against the drafter. Here, Valiant seems to have tried to perform an "e pluribus unum" with pollution incidents, but failed to do so clearly enough to cover this situation unambiguously.

When one moves away from a tight exegesis of the policy definition of "pollution incident," and considers the policy as a whole, the Limited Pollution Coverage form seems designed to cover short and discrete contamination incidents rather than historical and long-lasting pollution events. The facts in this case seem to fit within the kind of "core conduct" this policy was intended to cover rather than to exclude. Thus, viewing the two sentences defining "pollution incident" in the context of the whole policy does not exclude Konell's interpretation from the universe of "reasonably susceptible" constructions.

In sum, nothing in the definition "pollution incident" makes the language reasonably susceptible to only one meaning. Based on the plain meaning of the policy terms, as well as the overall context of the policy, it cannot be said that Konell's interpretation is unreasonable.

PAGE 8 - OPINION AND ORDER

Therefore, summary judgment on the coverage issue should be granted for Konell and denied for Valiant.

        2.     At the Work Site

Valiant contends there is no coverage because the only "pollution incident" at issue occurred not at the UBEHO work site, but at a separate property where petroleum pollutants were released into the fill soil obtained by Konell. In other words, because the petroleum pollutants were "released" elsewhere, the soil contamination did not result from a release of pollutants at the UBEHO work site, and the events cannot constitute a "pollution incident" under the policy. This is not a reasonable construction of "at the work site."

Konell offers the only reasonable interpretation of this term that is consistent with its plain meaning. A proper interpretation should focus on the property at issue – the UBEHO site. Valiant mistakenly argues that, because the property damage occurred elsewhere when petroleum leaked into the soils used by Konell for fill, this somehow precludes the possibility that property damage may also occur at the UBEHO site. The policy language, however, does not require this result. Here, the 'pollution incident' at issue was not the contamination of the soil at a separate location that Konell then delivered to the UBEHO work site. Rather, the 'pollution incident' was the contamination of the previously clean UBEHO site by the delivery of polluted fill soil. Whether the delivery of polluted soil is termed a "release," "emission," "escape," or "discharge," there is no question that Konell was working at the UBEHO work site when the property damage at issue occurred. This conclusion also compels the court to enter summary judgment in favor of Konell and against Valiant on the coverage issue.

      B.      Duty to Defend

Konell argues Valiant is liable for the attorneys fees incurred by Konell in defending itself in arbitration against the property owner, UBEHO. Valiant counters by arguing "those claims were never tendered from which a duty to defend could arise and would not create a duty to defend in any event." Def.'s Reply at 8.

It is well settled that an insurer's duty to defend is separate from and broader than its duty to indemnify. *GE Prop. & Cas. Ins. Co. v. Portland Cmty. Coll.*, __ F. Supp. 2d __, 2005 WL 2044315, at *3 (D. Or. Aug. 24, 2005) (citations omitted). The duty to indemnify exists where the facts proven at trial establish the insured's liability is covered by the policy. *Ledford v. Gutoski*, 877 P.2d 80, 84 (Or. 1994). On the other hand, the duty to defend is based on a possibility of coverage. Whether a duty to defend exists depends solely on two documents: the complaint and the insurance policy. *Id.* at 82 ("In evaluating whether an insurer has a duty to defend, the court looks *only* at the facts alleged in the complaint to determine whether they provide a basis for recovery that could be covered by the policy . . . .") (emphasis added). "The filing of the complaint, thus, triggers the duty to defend." *Schnitzer Inv. Corp. v. Certain Underwriters at Lloyd's of London*, 104 P.3d 1162, 1168 (Or. Ct. App. 2005) (holding that DEQ letter notifying insured property was on contaminated sites listing and requesting investigation and cleanup along with letter from insured to insurer detailing factual basis of DEQ's action was "the functional equivalent of a judicial complaint.").

Valiant relies on *Oregon Insurance Guaranty Association v. Thompson* to argue a copy of the complaint against the insured is essential to trigger the insurer's duty to defend and an insurer is not responsible for defense costs incurred prior to tender of the complaint to the insurer. 760

PAGE 10 - OPINION AND ORDER

P.2d 890, 893-94 (Or. Ct. App. 1989). An effective tender requires the insured to send a copy of the "suit" to the insurer, as without it, the insurer has nothing upon which to determine its duty to defend. *Id*. In *Thompson*, the court held the insurer had no duty to defend because the insured failed to provide the insurer with notice of the amended claim under which there was a possibility of coverage. *Id*. at 893 ("Notice of the claim is a condition precedent to the duty to defend.").

In most cases, the duty to defend arises when a third party files a complaint against the insured, and it is this complaint that the insurer compares to the policy. The Oregon Court of Appeals qualified what was necessary, in the absence of a typical adversarial complaint, to trigger the duty to defend. *Schnitzer*, 104 P.3d at 1168-69. In *Schnitzer*, the plaintiff (insured) voluntarily informed the Department of Environmental Quality ("DEQ") that certain properties used in plaintiff's industrial operations were contaminated. *Id*. at 1165. Plaintiff and DEQ entered into a consent order requiring plaintiff to determine "the nature and extent of releases of hazardous substances on or from plaintiff's property . . . and to develop, evaluate, and select appropriate removal and/or remedial measures that would comply with Oregon law." *Id*. (internal quotation marks omitted). In September 1991, plaintiff sent the defendant (insurer) a letter notifying it of DEQ's action listing the property, the consent order plaintiff voluntarily entered with DEQ, and requesting the insurer to immediately defend and indemnify it under the policy. *Id*. at 1166. Significantly, plaintiff enclosed a copy of DEQ's letter, along with other documents providing some details about DEQ's enforcement/compliance actions against plaintiff.

The insurance policy at issue in *Schnitzer* required the insurer to "'defend any suit against the insured seeking damages on account of such . . . property damage.'" *Id*. In the absence of a

PAGE 11 - OPINION AND ORDER

formal lawsuit against the insured, the court needed to determine "whether the information that [the insurer] received from plaintiff in 1991 also constituted a 'suit' within the meaning of defendants' policies." *Id*. at 1168. Because the insurance policy did not define "suit," the court conducted this inquiry based on the "ordinary meaning of the word." *Id*. ("One of the ordinary meanings of the word 'suit' is the 'attempt to gain an end by any legal process.'"). After reviewing the letter and other enclosures the plaintiff sent the insurer in 1991, the court concluded: "At the least, [the insurer] had to treat those documents at that time as the functional equivalent of a judicial complaint. When read together, they described the factual basis on which DEQ sought to hold plaintiff liable for the cost of the environmental cleanup of its property." *Id*. at 1169. Therefore, upon receipt of plaintiff's letter and other documents, the insurer "had the duty to defend plaintiff with regard to the actions against plaintiff being taken by the DEQ." *Id*.

        1.      What, if anything, was tendered to Valiant?

Relying on *Thompson*, Valiant contends "[t]o this date, the arbitration demand of UBEHO has never been provided to Valiant, nor has Konell made the demand part of the record on which the court could possibly determine that a duty to defend exists." Def.'s Reply at 8. Instead, Konell tendered only the arbitration *award* to Valiant after the Konell-UBEHO arbitration was completed. Therefore, Valiant urges the court to find it had no duty to defend, nor does it have a duty "to reimburse defense costs for an arbitration it was never informed of and never had an opportunity to defend." *Id*. In response, Konell asserts (1) "the claim by UBEHO had already been tendered to Valiant, and Valiant unequivocally denied coverage," and (2) "[g]iven Valiant's unequivocal denial of coverage, further tender by Konell would have been futile." Pl.'s Supp. Mem. at 5-6.

PAGE 12 - OPINION AND ORDER

The record does not contain the communication by which Konell notified Valiant of the dispute after Konell received UBEHO's letter of September 11, 1997. In its amended complaint, Konell states, "Upon receipt of the September 11, 1997 letter from UBEHO's counsel, Konell promptly "tendered the pollution claim to Valiant." Pl.'s Am. Compl. ¶ 8. However, in the summary judgment pleadings, Konell admits it "did not specifically tender the arbitration claim," apparently because Valiant had already denied coverage. Pl.'s Reply at 9. The parties seem to agree that Konell notified Valiant of UBEHO's claim, but this likely means something less than tendering the arbitration claim. Pl.'s Concise St. Mat. Facts ¶ 10; Def.'s Concise St. Mat. Facts ¶¶ 10, 13; Def.'s Mot. for Summ. J. at 3. Before analyzing whether this notification suffices to trigger Valiant's duty to defend, it is first necessary to determine the nature of Konell's notice to Valiant.

By a letter dated October 16, 1997, Valiant responded to Konell's communication. Mapes Decl., Ex. 2, (tabbed in red file). Valiant's response contains clues regarding the notification Konell communicated. First, based on Konell's communication, Valiant denied coverage and a duty to defend. At the very least then, Konell must have requested indemnification and defense which prompted the denial. Second, Valiant's letter states "the claimant [UBEHO] has now requested that Konell move the contaminated soil/sludge covered cement mixture from the site due to the future plans the claimant has in regard to developing the site. In turn, Konell has now submitted this request/claim to The Maryland [insurer related to Valiant] seeking indemnification and/or defense under the above referenced policy." *Id*. at 2. This suggests Konell included UBEHO's claim in its communication to Valiant. Third, Valiant's description of the dispute between UBEHO (the claimant) and Konell falls short of the ordinary meaning of "suit" –

PAGE 13 - OPINION AND ORDER

"Konell is being requested by the claimant to remove the soil." *Id*. at 6.  This suggests Konell notified Valiant of a third party claimant's mere request, rather than lawsuit or formal complaint, that the insured take action to remedy a situation.  Therefore, without the actual communication or notification in the record, the court is left making inferences and guessing as to the nature of this communication.

        2.      Does a duty to defend arise from Konell's notification communication?

Under the *Schnitzer* analysis, the court must decide whether the information the insurer received from plaintiff constituted a "suit" within the meaning of the policy.  Unlike the court's resort to the "ordinary meaning" of "suit" in *Schnitzer* though, the Limited Pollution Coverage Form policy here defines "suit."  A "suit" means:

> (a)    A civil proceeding in which damages because of "bodily injury" or "property damage" to which this insurance applies are alleged;
> (b)    A civil proceeding in which recovery is sought for "clean-up costs" or "site assessment costs" to which this insurance applies;
> (c)    An arbitration proceeding in which damages or costs are claimed and to which you must submit or do submit with our consent; or
> (d)    Any other alternative dispute resolution proceeding in which such damages or costs are claimed and to which you must submit with our consent.

Pl.'s Am. Compl., Ex. A at 39, ¶ 18.  All four possibilities contemplate some kind of proceeding between the insured and the claimant rather than a mere request from a third party claimant.  If the court focuses on the language in Valiant's response letter indicating "Konell has now submitted [UBEHO's] request/claim," the word "claim" points towards the existence of a proceeding in which UBEHO alleged property damage committed by the insured.  On the other

PAGE 14 - OPINION AND ORDER

hand, Valiant may have used the word "claim" to describe UBEHO's request because UBEHO is the third party *claimant* who, by definition, makes a "claim."

Without the actual "request/claim" made by UBEHO to Konell that Konell, in theory, submitted to Valiant, analyzing whether the duty to defend was triggered involves guesswork and speculation. Procedurally, the court is dealing with cross motions for summary judgment. Due to the existence of a genuine issues of material fact, that is, what was tendered to Valiant, the court denies both Valiant's and Konell's cross motions for summary judgment on the duty to defend issue.

III. CONCLUSION

On remand, I find the insurance policy is reasonably susceptible to Konell's interpretation of the "72 consecutive hour" provision and this incident did occur "at the work site." Valiant had a duty to indemnify its insured and therefore Konell's motion for summary judgment (#16) is GRANTED in part on this issue; Valiant is liable under the Limited Pollution Coverage policy to pay Konell $100,000 for the property damage. Because the question of whether Valiant also had a duty to defend involves speculation and guesswork, summary judgment on that issue is DENIED for both parties.

IT IS SO ORDERED.

DATED this   15th   day of May, 2006.

/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Court

PAGE 15 - OPINION AND ORDER